STATE

v.

Fernando RESENDE.

No. 95–346–CA.

Supreme Court of Rhode Island.

Jan. 23, 1997.

Andrea Mendes, Special Asst. Attorney General, Aaron Weisman, Assistant Attorney, for Plaintiff.

Paula Rosin, Assistant Public Defender, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes before us on the appeal of the defendant, Fernando Resende (defendant), from the entry of final judgment following his conviction by a jury in the Superior Court on one count of second degree child molestation and eight counts of first degree child molestation.

The victim of the child molestation sexual assaults, Amelia Resende (Amelia),[1] is the biological daughter of the defendant. She testified that, until she was seven years of age, she lived in the Cape Verde Islands with people other than her parents. After turning seven, she came to the United States and lived in Boston for a short time. Soon thereafter, she moved to Pawtucket to live with her aunt, uncle, cousins, and grandmother, and later with another aunt. Eventually, Amelia went to live with her father, the defendant, whom she had previously never really known. After living with him in Pawtucket for less than a year, Amelia and the defendant moved to Central Falls where they lived with Amelia's grandmother. For six months, Amelia, her grandmother, and the defendant lived on Barber Street in Central Falls, but they ultimately moved to a more permanent location, an apartment, on the third floor of a house on Brook Street in Central Falls, where the charged incidents of sexual child molestation allegedly occurred.

Amelia testified that about a year after she began living with the defendant, he began to touch her on her chest, legs and arms. She was eight years of age at the time. She testified that the defendant continued to touch her on her chest, legs and arms until her ninth birthday, after which the abuse escalated dramatically. According to Amelia's testimony, while she was taking a bath in preparation for her birthday party, the defendant entered the bathroom under the pretense of having to use the facilities. She heard the defendant tell her grandmother to ask Amelia to close the bathtub curtain,

which she did, but when the defendant entered the bathroom and shut the door behind him, he told Amelia to open the curtain and then told her to get out of the bathtub. She complied, and at that time, the defendant removed his clothes, and while both were naked, the defendant began touching her. Amelia testified that the defendant then ordered her to lie down on a towel that he had placed on the bathroom floor. Amelia described for the jury how, while then lying on the towel with her back to the floor, the defendant got on top of her and began touching her vagina. Soon thereafter, he engaged in sexual intercourse with her, despite her attempts to push him away. Amelia testified that she did not tell anyone about that act of sexual intercourse because at that time, when she was nine years of age, she felt ashamed and she thought that no one would believe her if she did inform someone.

She testified that when she was twelve, the defendant then began to force her to have intercourse some two or three times a week and that while so doing, he would show her erotic pictures that appeared in what was referred to as his favorite pornographic magazines. According to her testimony, the instances of sexual intercourse with the defendant continued, with increasing frequency, until she was thirteen years of age.

Throughout the duration of that sexual abuse, Amelia testified that she never realized that what she was doing was wrong because she had never lived with her father before and she thought that what her father was doing to her was all part of the ordinary father-daughter relationship. She testified that she finally began to suspect that the defendant's activities were atypical when she was about eleven or twelve years of age. At that time she saw a television program about rape and incest. Amelia recalled at the trial how, while she was watching one of those programs, with defendant present, he declared that he would either kill or deport any daughter of his who tried to put him into prison. Amelia told the jury in explanation of why she had not reported the sexual abuse

1. The first name of the defendant's daughter has been changed to protect her identity.

to outsiders that she believed that the defendant would do as he had threatened.

Amelia also testified that on her twelfth birthday she was also fondled and digitally penetrated by Marcelino Lomba (Lomba), the twenty-five-year-old brother of the boyfriend of a close family friend, Paula Tavares (Tavares). By the time Amelia was thirteen, she said that she considered Lomba to be her boyfriend. Amelia testified to several incidents of consensual sexual intercourse with Lomba that occurred periodically over the course of their relationship. Amelia's relationship with Lomba, it should be noted, overlapped some of the time during which the defendant was also having intercourse with her, but that her relationship with Lomba ended abruptly some six months after Amelia turned thirteen because at that time she discovered that Lomba had another girlfriend. Amelia testified that Lomba had always used condoms, but that the defendant had never done so.

Amelia explained to the jury that when the defendant learned of her relationship with Lomba, which was after it had already ended, he became very angry. He took her to the Pawtucket police station to make a complaint against Lomba. She was interviewed there privately [2] and told the Pawtucket police of her relationship with Lomba but did not inform them of the defendant's sexual abuse of her, despite the fact that she had then already told two of her friends about the defendant's abuse. The same day that Amelia gave her statement to the Pawtucket police, the defendant, Resende, signed a formal complaint against Lomba.[3] The following day, after having been interviewed at the Pawtucket police station, Amelia told another of her friends, Tavares, of her previous encounters of sexual intercourse with the defendant. Two days later she repeated that information to a school counselor as well as to the Pawtucket police. Subsequently, on the basis of Amelia's allegations, the defendant was arrested and charged with the nine counts of child molestation. After a jury trial in the Superior Court, he was convicted on all nine counts. This appeal followed.

The defendant's sole issue raised in his appeal concerns what he deems to have been error on the part of the trial justice in requiring that his testimony at trial be given through an interpreter.

The defendant elected to testify at his jury trial. Although his native language was Creole Portuguese, defense counsel had previously informed the trial justice that the defendant wanted to testify in English. Defense counsel, however, also informed the trial justice that she had previously retained an interpreter to assist the defendant in understanding the trial proceedings and also for the purpose of translating the defendant's testimony in the event that he chose to testify. Defense counsel additionally informed the trial justice that the defendant first wanted to attempt to testify in English with the interpreter standing by to assist in the event that he encountered difficulty in understanding any questions posed to him by counsel. The trial justice ruled that the defendant would have to choose one language in which to testify, either English or Creole, but then later reconsidered his ruling and said that "we'll have the interpreter standing by, and if Mr. Resende indicates that he feels he needs the assistance of the interpreter, we'll call on him."

During the defendant's direct examination his trial counsel posed several relatively straightforward preliminary questions to him to which he responded primarily with one-word answers. When the defendant was asked, "Had [Amelia] already been born by the time you ended that relationship [with her mother]," he responded, "I don't understand the question." At that point, defense counsel then requested that the interpreter be permitted to interpret the question for the defendant and the trial justice allowed the

---

2. The defendant first went to the Central Falls police station, but officials there sent him to the Pawtucket police station because the sexual relations between Lomba and Amelia had occurred at Lomba's house in Pawtucket.

3. That complaint eventually resulted, in Lomba's being charged, and, after plea, being sentenced to concurrent terms of twenty years probation on each of five counts of first degree child molestation. There was also a no-contact order entered that extended until Amelia turned sixteen.

interpreter to do so. The trial record discloses that the interpreter thereafter continued to interpret the questions put to the defendant by his trial counsel as well as his answers in response to those questions. After a trial-day midmorning recess, defense counsel once again requested the trial justice to permit the defendant to testify in English. The trial justice granted that request but specifically explained to the defendant that if he had any difficulty in understanding any question, he could call for the assistance of his interpreter. Five pages of trial transcript reveals that the defendant did testify in English. However, when he was asked, "On April 26, 1993, did you come to learn that your daughter was having sexual relations with another man," he then indicated, for a second time, that he did not understand the question asked by his defense counsel. The trial justice then stated:

"Now, I found the question to be understandable, and I think any fluent English speaker would have found the question to be understandable.

"Now, I'm not trying to tell the jury what they must, or must not find, but now I've heard the witness both with and without an interpreter.

"Now that he's signaled he does not understand the question that was put in plain English, I'm going to order that he testify through the interpreter."

After the trial justice's ruling, the interpreter then proceeded to interpret seven questions asked by defense counsel as well as the defendant's responses to those questions. Defense counsel then once again informed the court that the defendant wanted to resume testifying in English. This time, the trial justice denied defense counsel's request. He recognized and noted, at a sidebar conference, out of the hearing of the jury, that it appeared to him that defense counsel's trial strategy was to have the defendant answer, in English, those questions that could possibly be incriminating, but as far as those questions that he felt were not intended to elicit any incriminating evidence were concerned, that testimony would be translated through the interpreter. The trial justice told counsel:

"And, so that for his own benefit, for his own benefit, I'm going to ask, I'm going to persist with my ruling, and from a tactical point of view, * * * you got him to respond directly with eye contact on the jury when you were putting the guilt questions to him, so from a tactical point of view, you got the main impact of what you want to do. I've been in your chair before. I defended people accused of crime, and from a tactical point of view, this jury heard him forcibly and responsively, categorically say 'no' and 'never' to the questions that you wanted [him] to say those things to.
"* * *

"He did his thing in English * * *. He really did. You have no grievance there. He has no grievance. I'll let him protest his innocence [in] pretty clear-cut, straightforward, plain English, to this jury.
"* * *

"Now that we're back on the narrative trial, let him speak through his interpreter."

The defendant testified during the remainder of his testimony through the interpreter.

After trial, the jury returned guilty verdicts. The defendant was later sentenced to fifty years on all counts, twenty-five of which he would be required to serve with the remaining twenty-five suspended with probation.

The defendant claims in his appeal that the trial justice improperly failed to conduct a voir dire to determine the necessity of providing him with an interpreter during his testimony. That failure, he contends, constituted prejudicial error. The defendant posits that because the trial justice indicated, in the presence of the jury, that the defendant was having difficulty with questions "any fluent English speaker" could understand, the jury was led to believe by the trial justice's statement either that the defendant was pretending not to understand English so that he could hide behind his interpreter, and gain time to avoid answers that he felt might be incriminating, or that the defendant did not understand any English at all and had been coached in his answers to questions that

might point to his guilt. Therefore, according to the defendant's contentions, whichever scenario the jury chose to believe would result in the jury having to discount part of his testimony. The defendant asserts that that result could have been avoided had the trial justice conducted a voir dire and determined whether the defendant did in fact require the assistance of an interpreter throughout his entire testimony.[4]

We conclude that the defendant's assertions are without merit. None of the various cases relied upon in support of his position are relevant to the particular facts in this case. Unlike the cases he relies upon, this case does not involve a situation wherein the court was required to make a determination concerning whether an interpreter had to be appointed in order to preserve the right of the defendant to testify before the trial jury. In this case, in order to ensure the presentation of a strong defense for her client, it was defense counsel who decided not to rely upon the court's determination of whether an interpreter was needed. It was defense counsel who predicted the possibility that an interpreter might be necessary, and it was she, as a result, who had personally retained the services of an interpreter for just that anticipated contingency.

Despite the presence of her own interpreter, however, defense counsel chose, from what appears to have been a part of her trial strategy, to have the defendant testify as much as possible in English. In fact she repeatedly represented to the trial justice that the defendant wanted to testify in English. Not being called upon to decide whether an interpreter was actually needed, the trial justice was entitled to rely upon defense counsel's representations. He was commendably reluctant to interfere with counsel's trial strategies. Accordingly, he permitted the defendant to testify in English, as requested by his defense counsel, until the point at which it became patently clear to him that despite defense counsel's good intentions, the defendant could no longer proceed to testify in English without materially hampering the flow of information to the jury and potentially prejudicing his case. We see no error in the manner in which the trial justice dealt with the language problem as it arose during the course of the trial.

Although not directly on point, our decision in *Belanger v. Silva*, 120 R.I. 19, 384 A.2d 605 (1978), is instructive in regard a trial justice's decision to grant leeway to defense counsel in determining trial strategy. In that case, the trial justice asked defense counsel to decide whether a cautionary instruction was necessary after a trial witness had made a potentially prejudicial remark. Although the defendant's trial counsel in that case specifically requested that such a cautionary instruction *not* be given, the absence of such an instruction was later asserted as trial error on appeal. In refusing to find any error on the part of the trial justice in accepting trial counsel's request, we explained that

"in order to avoid highlighting a remark that the jury might otherwise have ignored, [the trial justice] allowed defendant to decide whether or not a cautionary instruction should be given. In opting against such an instruction, defense counsel said 'I certainly waive any request, and expressly request that the Court, at this time, not make any instruction to the jury.' In assigning as error both the trial justice's refusal to pass the case and his failure to give a cautionary instruction, defendant now attempts to renege on his counsel's trial strategy. This we will not permit." *Id.* at 24, 384 A.2d at 609.

Accordingly, for all the above reasons, we deny and dismiss the defendant's appeal. The final judgment of conviction appealed from is affirmed, and the papers in this case are remanded to the Superior Court.

---

4. Of course, it is the defendant's *assumption* that a voir dire would have resulted in the use of the interpreter throughout defendant's testimony. The trial justice could also have determined, at the end of the voir dire, that the defendant should testify entirely in English, which decision would have resulted in the same situation that arose at defendant's trial below.